## GRAY *v.* McLENDON.

1. The act of the General Assembly approved October 14, 1879 (Acts 1878-9, p. 125), providing for the appointment of railroad commissioners, prescribing their duties, etc., had in it the following provisions: "Any commissioner may be suspended from office by order of the Governor, who shall report the fact of such suspension, and the reason therefor, to the next General Assembly; and if a majority of each branch of the General Assembly declare that said commissioner shall be removed from office, his term of office shall expire. . . In case any commissioner becomes disqualified in any way, he shall at once remove the disqualification or resign, and on failure so to do, he must be suspended from office by the Governor, and dealt with as hereinafter provided. In any case of suspension the Governor may fill the vacancy until the suspended commissioner is restored or removed." *Held:*

(a) The provisions above quoted were not repealed by the act approved August 21, 1906 (Acts 1906, p. 100), providing for the election of commissioners by the people instead of being appointed by the Governor.

(b) Nor were these provisions in the act of 1879 repealed by the act approved August 6, 1907 (Acts 1907, p. 72). It was not the intention of the legislature, in passing the last-named act, to revise all the laws re-

lating to the railroad commission and thereby repeal existing laws in relation thereto.

2. Under the provisions above-quoted of the act of 1879, the Governor, for any reason satisfactory to himself, had the power to suspend from office any railroad commissioner, and a majority of the House and Senate, for any reasons satisfactory to themselves, had the power to remove from office a commissioner previously suspended by the Governor.

(a) The General Assembly had the right to create the office of railroad commissioner, with such right of suspension in the Governor, and right of removal in a majority of the members of the House and Senate, and the provision in the act giving such right of suspension and removal is valid whether the commissioner be elected by the people or appointed by the Governor.

(b) The action of the Governor in suspending, and of the majority of the members of the House and Senate in removing a suspended commissioner, is not subject to review by the courts.

3. The provisions above quoted, relating to the suspension and removal of railroad commissioners, did not constitute a special law. An act relating to persons or things as a class is a general and not a special law.

4. The provisions of the act of 1879 referred to in the preceding headnote do not violate the clause of the constitution of this State providing that "Protection to person and property is the paramount duty of government, and shall be impartial and complete," nor that clause of the constitution of the United States providing that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

5. The provision of the act of 1879, giving the General Assembly the power of removal of a railroad commissioner upon a majority of the House and Senate declaring that he shall be removed, is not void because contrary to that clause of the constitution of this State providing that "Every vote, resolution, or order, to which the concurrence of both houses may be necessary, except on a question of election or adjournment, shall be presented to the Governor, and, before it shall take effect, be approved by him, or, being disapproved, shall be repassed by two thirds of each house."

(a) Where a resolution is passed by a majority of the members of the House of Representatives, and a resolution is passed by a majority of the members of the Senate, both of which resolutions declare that a railroad commissioner is removed from office, the removal is not rendered inoperative because the resolutions were not approved by the Governor.

6. Nor are the provisions of the act of 1879 referred to in the preceding headnote void because contrary to that clause of the constitution of this State providing that "The Senate shall have the sole power to try impeachments," or that clause providing that "The House of Representatives shall have the sole power to impeach all persons who shall have been, or may be, in office."

7. The provisions of the act of 1879 quoted in the first headnote are not violative of art. 14, sec. 1, of the amendments to the constitution of the United States, providing that no State "shall deprive any person of property without due process of law," nor of art. 1, sec. 1, par. 3, of the

constitution of this State (Civil Code, § 5700), declaring that "no person shall be deprived of . . property, except by due process of law."

(a) A public office is a public trust or agency, and is not the property of the incumbent thereof; and when he is removed therefrom, he is not deprived of any property.

8. Nor are the provisions of the act of 1879 quoted in the first headnote violative of art. 1, sec. 3, par. 2, of the constitution of this State (Civil Code, § 5730), providing that "No bill of attainder . . shall be passed."

9. The word "next" in the above-quoted portions of the act of 1879, providing that the Governor shall report the fact of such suspension and the reason therefor to the next General Assembly, is to be construed in connection with its context, and means nearest in point of time; and if a General Assembly is in session when the suspension is made by the Governor, it is his duty to make his report to that General Assembly.

10. The provision in the act of 1879 of the General Assembly, creating the office of railroad commissioner, in which that body reserved to itself unlimited discretion to remove any one holding such office, does not confer on the General Assembly judicial power; and such provision is not void because contrary to that provision of the constitution of this State contained in the Civil Code, § 5720, declaring: "The legislative, judicial, and executive powers shall forever remain separate and distinct, and no person discharging the duties of one shall at the same time exercise the functions of either of the others, except as herein provided."

11. An act of the General Assembly can not be by the courts declared void on the ground that it is contrary to the principles of justice and equity upon which the government of the United States and of this State are founded, or to the spirit of our institutions and that of the constitution; but can only be declared invalid when it is inconsistent with some provision of the constitution of this State or repugnant to some provision of the constitution of the United States.

MARCH 19, 1910.

Quo warranto. Before Judge Charlton. Chatham superior court. November 2, 1909.

*Hitch & Denmark* and *Garrard & Meldrim,* for plaintiff in error.

*Andrew J. Cobb, Joseph R. Lamar, William A. Little,* and *Candlers, Thomson & Hirsch,* contra.

HOLDEN, J. 1. On August 21, 1907, Hon. Hoke Smith, then Governor of Georgia, appointed S. G. McLendon to fill an unexpired term as railroad commissioner, ending October 14, 1907. McLendon, at the time of this appointment, had been elected by the people as railroad commissioner for a term of six years, beginning October 15, 1907. On June 24, 1909, he was suspended from office by Governor Smith, who, the following day, reported to the General Assembly of Georgia the fact of such suspension and

the reason therefor.   After an investigation before a committee before which McLendon appeared and gave evidence, the Senate, on July 30, 1909, and the House of Representatives, on August 5, 1909, adopted resolutions removing McLendon from office; and on August 21, 1909, Hon. Joseph M. Brown, who had succeeded Governor Smith as Governor of the State, appointed Joseph F. Gray, the present plaintiff in error, to the office of railroad commissioner to fill the vacancy caused by the removal of McLendon. Shortly thereafter McLendon instituted quo warranto proceedings against Gray, upon the final hearing of which Hon. Walter G. Charlton, judge of the Eastern circuit, granted an order overruling the demurrer of Gray, the respondent, to the application of McLendon, the relator, sustaining the latter's demurrer to the former's plea of estoppel, and making the rule absolute and issuing a writ of ouster to remove Gray from office.   Gray excepted.

The constitution of 1877 provides that the power and authority of regulating freight rates and passenger tariffs is conferred upon the General Assembly, whose duty it is to pass laws for the purpose of such regulation, etc.   In pursuance of this provision of the constitution, the act of 1879 (Acts 1878-9, p. 125) was passed, providing for the appointment of three railroad commissioners by the Governor and prescribing their duties.   Many acts relative to the railroad commission and amendatory of the act of 1879 have since been passed.   The provision in the act of 1879 under which McLendon was suspended and removed, and which is now embodied in the Civil Code, § 2185, is as follows: "Any commissioner may be suspended from office by order of the Governor, who shall report the fact of such suspension, and the reason therefor, to the next General Assembly; and if a majority of each branch of the General Assembly declare that said commissioner shall be removed from office, his term of office shall expire."   One of the contentions of McLendon is that his removal was illegal, because "that portion of the act of 1879 under which relator's removal was attempted was repealed by the act approved 21st day of August, 1906, providing for the election of railroad commissioners by the people," and because "that portion of the act of 1879 under which relator's removal was attempted was repealed by the act approved 23d day of August, 1907, providing for the organization, powers, and duties of the railroad commission of Georgia."   The title of the act of

1906 is as follows: "An act to provide for the election of railroad commissioners of this State by the electors of the whole State, and for other purposes." The act provides "that the railroad commissioners of this State shall hereafter be elected. . . That successors to the incumbents be elected at the first general election preceding the expiration of their terms of office, respectively." In the title and body of the act the existence of the office of railroad commissioner is recognized, and the object of the act is simply to change the mode of selection of those who are to fill the office from that of having the Governor appoint them to that of having the people elect them. This act creates no new office, but simply provides a new way of filling an office already existing. With respect to their functions, duties, powers, etc., including the liability to removal from office and the method of effecting the same, the officers elected would be subject to the provisions of law existing at the time the method of selection to office was changed. If the change in the method of selecting the commissioners changed the law in regard to the right to suspend and remove them, it changed all other provisions of existing laws relating to their qualification, and the taking of an oath to be prescribed by the Governor. Obviously this was not the intention of the legislature in simply changing the method of selection of successors to those in office at the time the change was made. This act dealt only with that feature of the general scheme of the railroad commission by which its members were to be chosen, and the intent was to change the law only in this respect, leaving unaffected and of full force all provisions of existing laws respecting the commission not dealt with in the act; one of which provisions was the right of the Governor to suspend, and the General Assembly to remove, any member of the commission. Under the act of 1879, the commissioners had fixed terms of office, subject, however, to the right to remove them. The act of 1906 did not abolish the commission. It created no new office, but merely provided a new way of selecting successors to the commissioners then in office; and any one taking office by virtue of an election by the people—the new way provided—took it subject to the right of suspension and removal provided for in the Civil Code, § 2185 (quoted supra), which section is not inconsistent with the act of 1906, but perfectly consistent therewith. The fact that the method of selecting the commissioners was

changed from appointment by the Governor to election by the people did not make the question as to their suspension and removal a judicial one, and thereby repeal this right of suspension and removal provided for in the act of 1879. This question will be again referred to in another division of the opinion. There is nothing in the act of 1906, or that of 1907, showing that there was any express repeal of the provisions in question contained in the act of 1879. We do not think there was any repeal by revision or implication. There is nothing in the acts of 1906 or 1907 to show that it was the intention of the legislature to revise or supplant all existing laws on the subject with which they were dealing in these two acts. On the other hand, it appears that it was the intention to permit certain existing laws on such subjects to remain in force. We quote from 1 Lewis's Sutherland on Statutory Construction (2d ed.), 465-9, 511, 520, as follows: "In Winslow v. Morton [118 N. C. 486, 24 S. E. 417] the court sums up the general principles touching implied repeals in the form of rules which it formulates as follows: (1) 'that the law does not favor a repeal of an older statute by a later one by mere implication.' (2) 'The implication, in order to be operative, must be necessary; and if it arises out of repugnancy between the two acts, the later abrogates the older only to the extent that it is inconsistent and irreconcilable with it. A later and an older statute will, if it is possible and reasonable to do so, be always construed together, so as to give effect not only to the distinct parts or provisions of the latter, not inconsistent with the new law, but to give effect to the older law as a whole, subject only to restrictions or modifications of its meaning, when such seems to have been the legislative purpose. A law will not be deemed repealed because some of its provisions are repeated in a subsequent statute, except in so far as the latter plainly appears to have been intended by the legislature as a substitute.' (3) 'Where the later or revising statute clearly covers the whole subject-matter of antecedent acts, and it plainly appears to have been the purpose of the legislature to give expression in it to the whole law on the subject, the latter is held to be repealed by necessary implication.' Repeals by implication are not favored. This means that it is the duty of the court to so construe the acts, if possible, that both shall be operative. 'When some office or function can by fair construction be assigned to both acts, and they confer different powers to

be exercised for different purposes, both must stand, though they were designed to operate upon the same general subject.' "　"It is not enough that there is a discrepancy between different parts of a system of legislation on the same general subject; there must be a conflict between different acts on the same specific subject." "As laws are presumed to be passed with deliberation and with full knowledge of all existing ones on the same subject, it is but reasonable to conclude that the legislature, in passing a statute, did not intend to interfere with or abrogate any former law relating to the same matter, unless the repugnancy between the two is irreconcilable."　"The important question in these cases is whether a later act is intended by the legislature to be a revision of the law relating to the subjects within its purview.　It can not be so intended unless it is a complete substitute for the previous law and contains the only rule or all the legislation which is intended to have force with regard to those subjects."　In 26 Am. & Eng. Enc. Law, 725-727, the following text is used: "In order that an implied repeal may result from the principles now under consideration, the repugnancy appearing in the two statutes must be wholly irreconcilable, and it must also be clear and convincing, and following necessarily from the language used.　Hence every effort must be used to make all acts stand, and the later act will not operate as a repeal of the earlier one, if by any reasonable construction they can be reconciled.　The repeal in any case will be measured by the extent of the conflict or inconsistency between the acts; and if any part of the earlier act can stand as not superseded or affected by the later one, it will not be repealed."　And on pages 732-3 of the same work, the following appears: "But there must be an unmistakable intent manifested on the part of the legislature to make the new act a substitute for the old and to make it contain all the law on the subject; for mere similarity in the provisions of the two statutes is not enough to effect a repeal, even though the similarity may be such as to cause confusion or inconvenience."　Also see, in this connection, 7 Words & Phrases, 6215; *Georgia Railroad Co.* v. *Wright,* 124 *Ga.* 596, 609 (53 S. E. 251) ; *Horn* v. *State,* 114 *Ga.* 509 (40 S. E. 768).

The act of 1907 increased the number of commissioners to five, and made many other changes in the existing laws in regard to the commission.　The beginning of the title to this act is "An act

to increase the membership of the Railroad Commission of Georgia." The existence of a commission is recognized, and provision is made for an increase in its membership. The only instance in which the word "revise" appears in the title is in the sentence, "to revise, enlarge, and more clearly define the powers, duties, and rights of said commissioners." A law of revision is one of substitution. It repeals existing laws relating to the subject within its purview. Sec. 10 of the act of 1907 provides "That the procedure for the enforcement of penalties for a violation of the orders, rules, or regulations of the Railroad Commission, provided in sections 2195 and 2196 of the Code of Georgia of 1895, are hereby repealed," but nothing is expressly stated in the act about a repeal of other sections of the code in regard to the commission. Sec. 11 of this act provides that sections 2 and 4 of the act approved August 23, 1905, conferring upon the commission specified powers, are repealed, but nothing is expressly stated about repealing other sections of that act, or of any section of the other acts in regard to the commission. Sec. 12 of the act of 1907 provides that certain corporations and others therein named shall comply "with every order made by the commission under this act or under authority of acts heretofore passed." This section also provides for a forfeiture of $5,000 by corporations and others there named, violating "any provision of this act, or the acts heretofore passed." It is also declared in this section that "every violation of the provisions of this act or any preceding act or of any such order, direction, or requirement of the Railroad Commission shall be a separate and distinct offense." These and other provisions of the act of 1907 show that there was no intention to repeal all existing laws in regard to the commission, but show an intention to preserve such as are not in conflict with the new act. Why did the legislature repeal specific provisions in the old law in regard to the commission, if it was intended to revise and wipe out *all* provisions of such law? The law existing at the time of the passage of the acts of 1906 and 1907 (Civil Code, § 2202), making it the duty of the commission to investigate through freight rates from points out of Georgia to points in Georgia and from points in Georgia to points out of Georgia, and the law in section 2206 in regard to the commission fixing maximum rates and charges for storage of freight, as well as other provisions of law relating to the Railroad Commission existing at the

time of the passage of the acts of 1906 and 1907, relate to matters not dealt with in the latter acts, which fact indicates that it was not the intent of the legislature in such acts to deal exhaustively with the law in regard to the commission and revise and supplant *all other* laws relating thereto. Neither the act of 1906 nor that of 1907 provided for any oath to be taken by the commissioners, while that portion of the act of 1879 embodied in the Civil Code, § 2185, provides that "said commissioners shall take an oath of office to be framed by the Governor." It was not the intention of the legislature, in the enactment of the laws of 1906 and 1907, to dispense with the oath above referred to or destroy the right of suspension and removal provided for in the act of 1879. The act of 1907 created "the office of attorney for the Railroad Commission," and provided that the Governor appoint "said attorney, whose term of office shall be ·four years." This act also provided that "said attorney may be removed by the Governor at any time." The act of 1907 provides "that all laws and parts of laws in conflict with this act or any provision thereof be and the same are hereby repealed." The act of 1906 has in it a similar provision. In the case of *Johnson* v. *Southern Mutual &c. Assn., 98 Ga. 622*, 624-5 (25 S. E. 358), this court said: "It has been held, that while as a general rule a statute which revises the subject-matter of a former one works a repeal without express words to that effect, yet where the later act contains a provision . . to the effect that all laws and parts of laws in conflict with the act are thereby repealed, there is an implication that parts of the former acts not expressed in the new act are not repealed. (Sutherland, Statutory Construction, § 155, and cases cited; Lewis v. Stout, 22 Wisc. 234.) Whether this is so or not, we think it is clear that there can be no repeal by implication of a provision the subject-matter of which is not dealt with at all in the later act, and which is not in any way inconsistent with or repugnant to that act." There is nothing whatever in the acts of 1906 or 1907 dealing with the right of suspension and removal, and this right is not inconsistent with any provision in either act. The act giving this right has stood on the statute books for more than thirty years, and it is not contended that in the many amendments to the original act the legislature has made any effort to divest itself of such power till the acts of 1906 and 1907. The legislature in the act of 1907, in creating the office

of attorney for the commission, placed him in a position similar to that of the commissioners in giving the Governor the right to remove him at any time.

2. It was urged that the removal was illegal, for the following reasons: that the charges preferred against McLendon by the Governor in his report were purely of a political nature, and did not charge him with conduct amounting to misfeasance or malfeasance in office, or incompetency on his part to fill the office, and the charges were not legally sufficient to give the legislature jurisdiction to remove him under the act of 1879; that the acts charged against him by the Governor in his report did not have in them the legal quality of wrong, and did not afford the legislature jurisdiction over him other than by articles of impeachment; that the legislature had no jurisdiction to remove him under the act of 1879, unless it in terms found him guilty of the charges preferred against him by the Governor in his report; and that the resolutions purporting to remove him were not based on the message of the Governor, nor on any finding of fact by the legislature on the truth of the charges set out in the message. All of the provisions in the act of 1879 relating to suspension and removal are as follows: "Any commissioner may be suspended from office by order of the Governor, who shall report the fact of such suspension, and the reason therefor, to the next General Assembly; and if a majority of each branch of the General Assembly declare that said commissioner shall be removed from office, his term of office shall expire. . . In case any commissioner becomes disqualified in any way, he shall at once remove the disqualification or resign, and on failure so to do, he must be suspended from office by the Governor, and dealt with as hereinafter provided. In any case of suspension the Governor may fill the vacancy until the suspended commissioner is restored or removed." The act expressly provides that if a commissioner becomes disqualified to hold the office, the Governor *must* suspend him. In case of disqualification, the statute is mandatory that the Governor suspend, and in such instance he has no discretion. The provision in the act that the Governor must suspend when a commissioner becomes disqualified indicates that in making the other provision, providing generally that the Governor *may* suspend, there was an intention that for *any* reason other than disqualification the exercise of the right to suspend was in the un-

limited discretion of the Governor. No restrictions whatever are placed on the power of the Governor to suspend. He has the right. to suspend for any reason satisfactory to himself. The law does not say he may suspend for *specified causes*. He is restricted to no particular cause or reason. There is nothing whatever in the act saying, or from which it can be implied, that the Governor shall only suspend for a particular reason or cause. And it would not be proper for the court to read into the act that the Governor can only suspend for reasons or causes which the court thinks would afford proper grounds for suspension. Under the act, when a commissioner becomes disqualified, the Governor *must* suspend; and except when a commissioner becomes disqualified, the Governor *may* suspend for any reason satisfactory to him. The act provides that the Governor shall report to the General Assembly the reason for the suspension. But this is to be done *after* the suspension is made and becomes an existing fact. The suspension might be made, and there might be no report to the General Assembly for some time thereafter. No time is specified within which the report shall be made to the next General Assembly. And it might be delayed until the General Assembly would not have time to act before final adjournment. The suspension would be effective whether or not any report by the Governor was ever made. To suspend, the act simply requires "an order of the Governor." When that order is passed, the suspension exists. In the case of State *v.* Williams, 6 S. D. 119, 124 (60 N. W. 410, 412), the court, in construing an act providing that "The mayor shall have power to remove any officer appointed by him, whenever he shall be of the opinion that the interests of the city demand such removal, but he shall report the reasons for such removal to the council at its next regular meeting," said, on page 124: "The power thus conferred is absolute, and without any other limitation or° qualification than that he shall be of the opinion that the interests of the city require such removal.. The last clause of the section is not in the nature of a proviso or condition precedent to such removal, but a requirement that the mayor shall make the report therein specified, evidently for the purpose of apprising the city council and the citizens generally of the reasons for such removal; and a failure to make this report does not affect the action of the mayor in making the removal. This is evident from the fact that the

mayor is not required to report the reasons for his proposed re-moval, but 'the reasons for such removal.' This language pre-supposes that the officer has been actually removed. Again, the mayor is required to report to the city council 'at its next regular meeting.' This language also presupposes that the act of removal has been accomplished. . . Similar language is used in section 7 of the same article. That section provides that 'the mayor may release any person imprisoned, . . and shall report such re-lease, with the cause thereof, to the city council at its first session thereafter.' It will not be claimed, we apprehend, that when the mayor issues his order releasing a person imprisoned, the city jailer could detain such person in custody until he ascertained that the mayor has reported the cause of such release to the city council, or that in case a person is released upon the mayor's order, and the mayor fails to make the specified report, the person could upon that account be rearrested and again placed in custody. The prisoner is lawfully released, whether the mayor reports to the city council or not. A somewhat similar provision is found in section 5, art. 4, of our State constitution. That section provides that the Governor may, in certain cases, grant pardons to a certain class of convicts; but he is required 'to communicate to the legislature at each regu-lar session' the names, etc., 'with his reasons for granting the same.' When the Governor grants a pardon, we think no one would claim that the pardon would not take effect until the Gov-ernor had reported his reasons for granting the same to the legis-lature, or that the warden of the State prison could detain the con-vict until he ascertained that the reasons for the pardon had been communicated to the legislature by the Governor. The require-ment that the Governor or mayor report their reasons for their ac-tions is designed to act as a check upon the improvident or im-proper exercise of the power by the officer exercising it, but is no limitation upon or qualification of the power, so far as it affects the act done. The removal, the release, or the pardon is unaffected by the failure of the officer to comply with the requirements of the law by reporting his reasons for the act done." See also State v. Grant, 14 Wyo. 41 (81 Pac. 795, 1 L. R. A. (N. S.) 588, 116 Am. St. R. 982) ; Trimble v. People, 19 Colo. 187, 197 (24 Pac. 981, 41 Am. St. R. 236). The act of 1879 has in it a provision which is the last sentence in Civil Code, § 2185, namely: "In any case of

suspension the Governor may fill the vacancy until the suspended commissioner is restored or removed." Nothing is said in this clause about any report of the Governor. The suspension is complete when there has been issued "the order of the Governor," whether or not any report is ever made. If the Governor suspend a commissioner and make no report of the "fact of suspension" still the General Assembly may restore or permanently remove the commissioner. The right of the General Assembly to restore or remove a commissioner is not dependent upon the Governor making a report, but is dependent only on the fact of his suspension. The duty of reporting the reasons for the suspension, when one is made by the Governor, is directory only, and the report of the reasons for suspension is to be made simply for information to the General Assembly and the public. It is the right of the Governor to suspend for any reason satisfactory to him, and not for any particular reason. He can suspend without notice or hearing.

The right of removal by the General Assembly is no less plenary than the right of suspension by the Governor. As above stated, the General Assembly may restore or remove the suspended commissioner whether the Governor report his reasons for suspension or not. The fact that the General Assembly may remove or restore the suspended commissioner, whether or not any report is made of the reasons for suspension by the Governor, shows that the General Assembly in removing the suspended commissioner need not consider any reasons the Governor may have had for the suspension by him, but are to be governed by any reasons satisfactory to them. If the Governor reports his reasons, the General Assembly, in determining whether they will restore or remove the suspended commissioner, may remove him for the reasons contained in the report, or for other reasons satisfactory to a majority of the House and Senate. There is nothing whatever in the act saying, or from which it may be inferred, that the General Assembly can not remove unless the reasons given by the Governor for suspension are satisfactory to the General Assembly, or are reasons involving a quality of wrong, or grounds of impeachment, or unless the statements in the report are true, or without giving notice or according a hearing. The only limitation on the power of removal simply by declaring one is that the Governor must previously suspend. This being the only limitation prescribed by the act, there are no

other limitations.    See State *v.* Grant, supra.    In 29 Cyc. 1408, 1409, it is stated: "The executive power of removal is either an arbitrary or a conditional one.    In case the power is an arbitrary one—and it is arbitrary when incident to the power of appointment—no formalities such as the presentment of charges or the granting of a hearing to the person removed are necessary to its lawful exercise. . . A conditional or limited power of removal, as for cause, may, however, be exercised only after charges have been made against and a hearing accorded the person to be removed."    In the case of Trimble *v.* People, supra, it is said: "Whatever may be the rule as to those officers, the removal of whom for certain specified causes is provided by other statutes or by the constitution, the Governor, under the statute before us, is not required, as a prerequisite to removal, to institute an investigation in the nature of a judicial or quasi-judicial inquiry. The investiture of the power of removal here given is restricted in but two particulars: it must not be exercised for political reasons, and the cause of removal must be stated in writing.    In considering removals under this act we must assume that the lawmaking body was of the opinion that the requirement that the cause of removal should be stated in writing was the only check necessary to prevent an arbitrary and oppressive abuse of the power."    The existence of the power of removal by the General Assembly in the act of 1879 is restricted to but one instance, to wit, there must first be a suspension by the Governor.    If the commissioner is disqualified, the Governor *must* suspend.    He *may* suspend when there exists any other reason which he *alone* deems a proper one for suspension. In the case of State *v.* Grant, supra, the court says: "But the legislature, having declared that removals may be made, proceeds to prescribe the method or the conditions under which such removals may be made.    Having conferred the power upon the Governor in language which is plenary, it adds: 'Provided, reason for such removal shall be filed in the office of the Secretary of State in writing, subject to inspection by any person interested'— thereby declaring the express conditions and limitations under which the Governor may act.    Having entered upon the realm of limitation, the enumeration of one condition precludes the idea that there should be others not expressed.    'Expressio unius est exclusio alterius.'    To our minds the language of the proviso is in-

·consistent with the idea of a hearing. The sole restraint upon the action of the Governor is the filing of his reasons for the removal, and the consequent check of public opinion." The court in the case of Trimble *v.* People, *supra*, on page 197, continues: "If removals were only authorized for certain specified reasons, a question of procedure might have been presented, more difficult of solution. In this instance the cause stated does not import any wrong-doing to the officer; and while it may not be such as would have had weight with a court, it was deemed sufficient by the Governor, and his judgment is final and decisive. The office of police commissioner is created by the statute; it was accepted by the relator under the conditions imposed by the act, among which was that the incumbent should hold it subject to removal by the Governor for cause. Under the statute the cause that may be sufficient to warrant removal is to be determined by the Governor; and no mode of inquiry being prescribed, he is at liberty to adopt such mode as to him shall seem proper, without interference on the part of the courts." In the case of Eckloff *v.* District of Columbia, 135 U. S. 240 (10 Sup. Ct. 752, 34 L. ed. 120), the court had under consideration an act giving to the commissioners of the district power, in regard to the police force, "to abolish any office, to consolidate two or more offices, reduce the number of employees, remove from office and make appointments to any office under them authorized by law," and on page 244 the court said: "The power to remove is a power without limitations. The power is granted in general terms, as well as the authority to adopt such provisions as may be necessary to carry it into execution. Full authority is given to the commission; and in the absence of rules and regulations directing a different procedure, its act of summary dismissal can not be challenged." In the case of Commonwealth *v.* Harriman, 134 Mass. 314, the court ruled: "Under the const. Mass. c. 3, art. 1, providing that 'all judicial officers, duly appointed, commissioned, and sworn, shall hold their offices during good behavior, . . provided, nevertheless, the Governor, with consent of the Council, may remove them upon the address of both houses of the Legislature,' a judicial officer may be removed by address, for misconduct and maladministration in office, although he is liable to trial therefor, by impeachment, by c. 1, § 2, art. 8, of the constitution. An address to the Governor by both houses

of the legislature, under the const. Mass. c. 3, art. 1, requesting the removal of a judicial officer, need not assign any reasons therefor." On page 329 the court said: "The constitution authorizes the removal without any reason being assigned for it; and therefore it is wholly immaterial what evidence or causes induced the Legislature to vote the address, or led the Governor and Council to act upon it." In the case of *Asbell* v. *Mayor &c. of Brunswick*, 80 *Ga.* 503 (5 S. E. 500), the 3rd headnote is as follows: "Under the act of the legislature incorporating the city of Brunswick, the mayor and aldermen could remove a police officer executively, if they thought proper to do so, without trying him at all, provided they had good and sufficient cause therefor. If they had not, he would probably have a right of action against the city for his salary." In the corresponding division of the opinion, on page 505, the court says: "The 9th section of this act is as follows: 'The said mayor and aldermen shall . . elect all permanent officers of the city, . . and prescribe their duties, . . and may, at their discretion, remove them and all others from office, for a breach or neglect of duty, or for bribery or incapacity; and they shall also appoint all such other officers of the city as they may deem necessary and proper for the police and good government of the same, and regulate the time and manner of electing said officers, and prescribe their duties, . . and remove them for good and sufficient cause.' And to do this, they would not be obliged to sit as a court. They must have good and sufficient cause; otherwise the officer removed without good cause would probably have a right to bring an action against the city for his salary." Also see, in this connection, *State* v. *Frazier*, 48 *Ga.* 137.

The office of railroad commissioner is not a constitutional office. It is one created by the General Assembly. The General Assembly in creating this office reserved the right to remove or restore any one filling it and suspended by the Governor, simply by a majority of the House and Senate declaring that he should be removed or restored. In order to make the removal or restoration effective, it is only necessary, under the express terms of the fact, that such majority so declare. The only limitation on the right of the majority to so declare is that the Governor shall previously suspend. It is not required that they shall make any kind of investigation or inquiry, or shall have specified reasons for such restoration or re-

moval; but in creating the office, the right is reserved to declare the officer restored or removed by a majority of the House and Senate; and this may be done for any reason satisfactory to them. If the General Assembly, without any investigation, special findings, notice, or hearing, were to declare the suspended commissioner restored, would it be illegal? Certainly no investigation, special findings, notice, or hearing would be necessary before the General Assembly could restore a suspended commissioner. If such things are not necessary to restore, they are not necessary to remove. A majority of the members of the House and Senate can either restore or remove a suspended commissioner with or without notice to any one, or any investigation whatever, and without assigning any reason therefor.

(*a*) The right of the General Assembly to create the office existed beyond all question, and the provision that the person filling it might be suspended by the Governor and removed by the General Assembly for such causes only as to them were satisfactory, respectively, violated no provision of the constitution of this State, or of the United States; and such provision is valid whether the commissioners were elected by the people or appointed by the Governor. In another division of the opinion we have shown that the power of suspension and removal is not necessarily a judicial power. In 23 Am. & Eng. Enc. Law, 652, it is said: "If not restrained by a constitutional provision, the legislature may abridge the term of office of a railroad commissioner, or specify an event upon the happening of which such term shall end, or may reserve to itself the right to remove the incumbent of the office, or to the governor the right to suspend him." And in State *v.* Wilson, 121 N. C. 425 (28 S. E. 554), it was said: "The office of railroad commissioner being purely of legislative origin, and administrative duties, the action of the legislature in reserving the right of removal was not beyond its constitutional power." See also 29 Cyc. 1406; 23 Am. & Eng. Enc. Law, 432; 12 Am. & Eng. Ann. Cases, 996; Mechem on Public Officers, §§ 444, 447, 448, 454, 465; Throop on Public Officers, §§ 343, 346, 402, 392.

(*b*) This court is powerless to review the action of the Governor in suspending, or that of the General Assembly in removing McLendon. They had unlimited discretion, and the action of the former in suspending, and of the latter in removing, are binding.

There is no provision in the act for any court to review their action, and we have no right to interfere therewith. When the General Assembly, by a majority of each branch, declared that Mc-. Lendon was removed from office, their action was final, and no court has any right to inquire into the question as to what were their reasons for making the removal, or whether or not the reasons on which the removal was based were sufficient reasons. In the case of *Akerman* v. *Board of School Commissioners,* 118 *Ga.* 334, 337 (45 S. E. 312), it was said: "It is true, as stated in Spelling on Injunctions and other Extraordinary Remedies (vol. 2, 2d ed. § 1577), that 'if the power of removal [from office] rests in the discretion of any other officer or body of officers, the exercise of such discretion will not be controlled' by the courts, 'since the officers charged with the duty of determining the sufficiency of the causes of removal and the fitness of the party removed to continue in office are presumed best qualified to pass upon these questions,' unless by statute their power be limited to removal 'for due cause.'" In 29 Cyc. 1405, it is declared: "Power to suspend may be exercised without notice to the person suspended, and the suspension, when made in the exercise of a legal power to suspend, is irreviewable by the courts." See, in this connection, State *v.* Dahl, 140 Wis. 301 (122 N. W. 748) ; Throop on Public Officers, § 361.

3. It is also contended that the act of 1879, providing for the suspension and removal of a railroad commissioner, is void because it violates art. 1, sec. 4, par. 1, of the State constitution, which states that "no special law shall be enacted in any case for which provision has been made by an existing general law," in that there was in force, at the time of the enactment of the act of 1879, a general law (Political Code, § 229), providing for the removal of all public officers, declaring: "All offices in this State are vacated: . . By decision of a competent tribunal declaring the office vacant." There is no merit in this contention. The act of 1879 was in no sense a special law. A statute relating to persons or things as a class is a general law. In *Crovatt* v. *Mason,* 101 *Ga.* 246 (28 S. E. 891), it was ruled: "An act of the General Assembly, which renders councilmen and aldermen of the cities and towns of this State incompetent to hold any other municipal office during the time for which they were chosen, is not unconstitutional because by its terms such act is

made applicable only to cities and towns of two thousand inhabitants or more; but the same is a general act, and as such is applicable to all towns and cities within the State falling within the designated class at the time of its passage, or which may do so thereafter." See *Sasser* v. *Martin*, 101 *Ga.* 447, 454 (29 S. E. 278) ; State v. Parsons, 40 N. J. Law, 123. In Wheeler v. Philadelphia, 77 Penn. 338, it was ruled: "A statute relating to persons or things as a class is a general law; one relating to particular persons or things of a class is special." The same doctrine is announced in Sutherland on Stat. Con. (2d ed.), §§ 195, 196. The act of 1879 provides for the suspension and removal of all railroad commissioners in the State, and is in no sense a special law. To hold legislation of this kind void as a special law would establish a principle which, when applied to all acts of the legislature, would paralyze the legislative branch of the government. Much of our legislation relates only to a particular class of persons or objects; but this does not make it susceptible of being classed as special legislation.

4. One of the grounds of attack on that provision in the act of 1879, giving the right of suspension and removal of a railroad commissioner, is that it violates art. 1, sec. 1, par. 2, of the State constitution, providing: "Protection to person and property is the paramount duty of government, and shall be impartial and complete," and violates art. 14, sec. 1, of the amendments to the constitution of the United States, providing that no State shall "deny to any person within its jurisdiction the equal protection of the laws," in that it undertakes to authorize the removal of a railroad commissioner from his office and deprive him of the salary thereof without notice or opportunity to be heard, whereas all other public officers are protected in the title and right to their office and their right to the salary thereof, and can not be removed until after trial and judgment by a competent tribunal, by virtue of a general law (Political Code, § 229), declaring that "all offices in this State are vacated: . . By decision of a competent tribunal declaring the office vacant."

In the case of State v. Wilson, 121 N. C. 425 (28 S. E. 554), it was ruled: "By Laws 1891, c. 320, § 1, providing that the governor shall, without judicial proceeding, suspend any railroad commissioner who becomes interested in a railroad, does not deny to

such commissioner the 'equal protection of the law,' in violation of const. U. S. amend. 14, § 1." On page 461, the court said: "As to the equal protection of the laws guaranteed by the constitution of the United States, it is well settled that special legislation is not objectionable where it is made to apply equally and without unjust discrimination to all who may be affected by it. The fourteenth amendment does not prohibit legislation limited as to objects or territory, but merely that all persons subjected to it shall be treated alike under like circumstances and conditions. Hayes v. Missouri, 120 U. S. 68, 7 Sup. Ct. 350 [30 L. ed. 578]; Railroad Co. v. Mackey, 127 U. S. 205, 8 Sup. Ct. 1161 [32 L. ed. 107]; Lowe v. Kansas, 163 U. S. 81, 88, 16 Sup. Ct. 1031 [41 L. ed. 78]." This case was taken to the Supreme Court of the United States, and is reported in 169 U. S. 586, 595 (18 Sup. Ct. 435, 42 L. ed. 865). That court said that "there is no fair color for claiming that his rights under the Federal constitution have been violated, either by depriving him of his property without due process of law or by denying him the equal protection of the laws." The act creating the office provided terms upon which it could be held. In this act the right of removal was preserved to the legislature, and one accepting the office did so subject to this reserved power in the body creating the office, and can not be heard to say that he is denied the equal protection of the laws because he is not accorded the same privileges as to proceedings where his removal is attempted as are those holding offices of a different class in the State. The law operates equally upon all the commissioners accepting office under the act. The law is in no sense discriminatory in character. The act creates new offices of a certain class, upon such terms that any one accepting one of them does so with the power in the legislature to remove him, and is uniform in effect throughout the State and upon all persons of a given class, none of whom have any right of complaint that it denies them the equal protection of the laws.

5. It is further contended that the provision of the act of 1879, that the Governor may suspend and the General Assembly may remove a commissioner, violates art. 5, sec. 1, par. 17, of the State constitution (Civil Code, § 5820), providing that "Every vote, resolution, or order, to which the concurrence of both houses may be necessary, except on a question of election or adjournment,

shall be presented to the Governor, and, before it shall take effect, be approved by him, or, being disapproved, shall be repassed by two thirds of each house," because the provision of the act undertakes to make effective a vote, resolution, or order of a majority of the House and Senate without presentation to the Governor and without his signature and approval. It is further urged that the resolution of the Assembly removing McLendon was illegal because not approved by the Governor. The provisions of the constitution above quoted have no application to the action of the General Assembly in removing a commissioner under the act of 1879. The act provides: "If a majority of each branch of the General Assembly declare that said commissioner shall be removed from office, his term of office shall expire." No concurrent action or joint resolution of the House and Senate was necessary. The House and Senate each complied with the requirement of the act of 1879 when they separately acted, declaring that McLendon be removed from office. It was not necessary that the same resolution should be passed by each. In fact separate resolutions were passed by the House and the Senate, though both had in them language meaning to declare that McLendon be removed from office. If part of the above-quoted clause of the constitution is applicable, all of it is; and if a resolution passed by both branches of the Assembly was necessary, and if it was necessary for it to become effective that it be approved by the Governor, then if the Governor disapproved it, in order for it to become effective, either in restoring or removing a suspended commissioner, it would be necessary for it to be passed by a two-thirds vote of the House and Senate. The act of 1879 was complied with when a majority of the House declared in any certain way that McLendon was removed, and a majority of the Senate did likewise, though there was no joint resolution or one containing the same language passed.

6. The contention is made that the provision in the act of 1879, giving the General Assembly the power of removal by a majority vote of the House and Senate, is contrary to the clauses in the State constitution providing that "The House of Representatives shall have the sole power to impeach all persons who shall have been or may be in office," and "The Senate shall have the sole power to try impeachments." It is contended that the only method by which the General Assembly could remove McLendon from the

office of railroad commissioner, to which he was elected by the people, was by impeachment proceedings under the above-quoted clauses of the constitution. There is nothing in these clauses to show that an officer can be removed only by impeachment proceedings. They provide that the House shall have *sole* power to impeach, and the Senate the *sole* power to try impeachments. The only purpose of these clauses is to designate the bodies who shall have the power referred to in regard to impeachment proceedings, and to provide that these powers shall rest nowhere except in the House and Senate. The power of removal of railroad commissioners is given the General Assembly simply by a majority vote thereof, and such removal does not disqualify the person removed from holding any office in this State, whereas under the constitution (Civil Code, § 5739), the Senate, when trying impeachments, must be presided over by a Justice of the Supreme Court, and a vote of two thirds of the members of the Senate present is necessary to a conviction of the person tried; and under the constitution (Civil Code, § 5760), such a conviction of a person in impeachment proceedings disqualifies such person from thereafter holding any office of honor, trust, or profit in this State. The removal of a railroad commissioner under the act of 1879 is in no sense an impeachment of such officer. See, in this connection, Atty.-General *v.* Jochim, 99 Mich. 358 (58 N. W. 611, 23 L. R. A. 699, 41 Am. St. R. 606); 23 Am. & Eng. Enc. Law, 434; Throop on Public Officers, § 400. This office was created by the legislature, and not by the constitution, and the act creating it provided that it be filled by appointment by the Governor. The fact that the legislature afterward provided that these officers be elected by the people does not affect the principle upon which the above ruling is made. The office was created by the legislature, with the right of removal in that body, and under the law the commissioners were elected by the people, and the commissioners accepted the office subject to the terms of the act creating it. If such terms were for any reason undesirable, they could be changed by the people through their representatives in the General Assembly, but until changed, the terms of the act creating the office were binding.

7. It is contended that the act of 1879 is contrary to art. 14, sec. 1, of the amendments to the constitution of the United States, providing that no State shall "deprive any person of property with-

out due process of law," in that the act undertakes to deprive a public officer, holding office for a definite term, of the office and the salary thereof, without making any provision "for notice to said officer, or for a hearing or trial on charges regularly preferred against him, as a condition precedent to his removal from said office;" and that the act, for the same reasons, is contrary to art. 1, sec. 1, par. 3, of the State constitution (Civil Code, § 5700), declaring that "no person shall be deprived of property except by due process of law." We can not subscribe to the doctrine that a public office is property. The incumbent of a public office has no property right, or vested interest, or contract right, in the office. In the case of *Coleman* v. *Glenn,* 103 *Ga.* 458 (30 S. E. 297, 68 Am. St. R. 108), the headnotes are as follows: "1. A statute declaring that a county officer, elected for a fixed term, 'shall be removable' from his office 'by the judge of the superior court of the county, on the address of two thirds of the grand jury, for inefficiency, incapacity, general neglect of duty, or malfeasance or corruption in office,' but which makes no provision for any notice to such officer, or for a hearing of the charge or charges against him, with opportunity to make his defense, is unconstitutional; and an order of removal based upon such a statute is a mere nullity. 2. The writ of injunction does not, however, in such a case, lie to restrain the proper State official from issuing a commission to another person illegally appointed to such office upon the theory that a vacancy existed therein. 3. The equitable petition filed in the present case prayed for no relief which the court had authority to grant." Justice Little specially concurred in the judgment of affirmance of the decision of the court below refusing the injunction, but his reasons for specially concurring do not appear. The statement of facts preceding the opinion does not show that the act declared unconstitutional was attacked because of being inconsistent with any provision of the constitution. Upon an examination of the original record, we do not find that the constitution, or any provision thereof, is referred to therein. The petition states, among other things, that petitioners constituted the board of education of Tattnall County; the grand jury, in its presentments, recommended that petitioners be removed from office for "general neglect of duty in not looking after the school interest in our county as close. and attentive as they should have done;" the pre-

siding judge passed an order removing petitioners and appointing others in their place; "the grand jury did not intimate to either of the petitioners their recommendations; they were ignorant of the acts of the grand jury, and had no opportunity to defend themselves before that body against the grave charges made, and of which they were not guilty; that they have been, without a due process of law, deprived of their office, their reputation injured, and they published to the world by said grand jury as being unfit to discharge their official duties. . . That if they had known of the anticipated actions of said grand jury, they would cheerfully and willingly gone before said grand jury and vindicated their acts as members of the board of education. That said grand jury acted without law or legal authority in recommending that your petitioners be removed from office, as said grand jury failed to give your petitioners an opportunity to vindicate and defend their official acts, and your honor have removed them instanter from office without giving them a hearing." The petition prayed, for an injunction against the State school commissioner issuing commissions to the newly appointed members of the board; that the latter show cause why the recommendation of the grand jury should not be declared inoperative, and the order of the presiding judge should not be vacated; and that petitioners be allowed to show cause why they should not be deprived of their office. It was further prayed that the recommendation of the grand jury be annulled and the order be abrogated. In the first headnote of the decision it was stated that the act in question was unconstitutional, but in the petition it is nowhere charged generally that the act was unconstitutional, or that it violated any particular clause of the constitution. It has been many times held by this court, that, in order to make for decision a question regarding the unconstitutionality of an act, some particular clause of the constitution must be pointed out with which the act is inconsistent. The court, in the case above referred to, held that the writ of injunction would not lie to restrain the State school commissioner from issuing the commission, and that the petition prayed for no relief which the court had authority to grant. Moreover, the act which that decision undertook to declare unconstitutional (found in the Political Code, § 1356), provides: "Any member of a county board of education shall be removed by the judge of the superior court of the county,

on the address of two thirds of the grand jury, for inefficiency, incapacity, general neglect of duty, or malfeasance or corruption in office." It will be seen that that'act provides for removal only for causes specified in the act. In the opinion, on page 461, the court said: "It may therefore be considered as settled beyond all doubt or peradventure, that a public officer who has under the law a fixed term of office, and who is removable only for definite and specified causes, can not be removed without notice and a hearing on the charge or charges preferred against him, with an opportunity to make defense." In the case we are considering, the act does not provide for the suspension or removal of a railroad commissioner "for definite and specified causes;" and the ruling in the *Coleman* case above quoted is not authority for the position that where a railroad commissioner is suspended or removed there must be "notice and a hearing on the charge or charges preferred against him, with an opportunity to make defense." The question as to whether or not "a public officer who has under the law a fixed term of office, and who is removable only for definite and specified causes, can not be removed without notice and a hearing on the charge or charges preferred against him, with an opportunity to make defense;" need not be considered. Conceding, without deciding, that this is true, we can not subscribe to the doctrine that it would be true because the holder of the office has a property interest therein. Such an act could not be contrary to the provisions of the constitution declaring that no one shall be deprived of property without due process of law, unless the holder of such office has a property interest therein.

In the case of *State* v. *Dews, R. M. Charlton,* 397, 400, 401, it is said: "That a public office is the property of him to whom the execution of its duties is entrusted is repugnant to the institutions of our country, and is at issue with that universal understanding of the community which is the result of those institutions. Public officers are, in this country, but the agents of the body politic, constituted to discharge services for the benefit of the people, under laws which the people have prescribed." In the case of *City Council of Augusta* v. *Sweeney,* 44 *Ga.* 463 (9 Am. R. 172), it was ruled: "Where a public office is created by the authorities of a municipal corporation: *Held,* that an incumbent of the office does not have such an interest in the salary as that the corporation can

not, at its discretion, abolish the office, and by so doing deprive him of his right to tender his services and demand his salary for the full time for which he was elected;" and on page 465 it was said: "If the office be created by legislative enactment, the legislature may abolish it; and if it be created by municipal authority, that same authority may abolish it." In the case of *Wessolowski* v. *Gilbert*, 51 *Ga.* 224, 227, it was said "If the office be the creation of the legislature, it may be abolished by legislation." In the case of *Dallis* v. *Griffin*, 117 *Ga.* 408 (43 S. E. 758), it was ruled: "No man has a vested right to an office created by the legislature. That body may 'legislate him out' of such office at its will;" and on page 410 it was said: "It is well-settled law that no man has a vested right to an office created by the legislature. That body may abolish or modify an office which it has established, may shorten or lengthen the term prescribed for the officer who is to hold it, or may decrease or increase the salary attached thereto. So firmly fixed is this principle that extended discussion of it is unnecessary." Also, in this connection, see: *Lyon* v. *Norris*, 15 *Ga.* 480, 482; *Collins* v. *Russell*, 107 *Ga.* 426 (33 S. E. 444); *Waters* v. *McDowell*, 126 *Ga.* 807, 809 (56 S. E. 95); *Drake* v. *Beck*, 129 *Ga.* 465, 469 (59 S. E. 306). The legislature can not abolish a constitutional office. *Morris* v. *Glover*, 121 *Ga.* 751 (49 S. E. 786). It is the right of the legislature beyond question to abolish an office it creates, and this it can do without notice to the one who may be holding it. If the legislature could not remove one from an office without giving him a hearing because he has a property interest in the office, how could it abolish the office itself without giving him a hearing? If the incumbent of an office has such a property right therein that he could not be removed therefrom without a hearing, the same reason would prevent a destruction of the office itself without giving him a hearing. When the office is abolished, his right to hold it has been as completely taken away from him as when he has been removed from the office and the office left standing. The first provision in the constitution of this State declares, "Public officers are the trustees and servants of the people, and at all times amenable to them." In 29 Cyc. 1367, it is said: "The only jurisdiction in the United States which ever regarded an office as having the characteristics of a property right is North Carolina, which, however, at the present time takes

the view of the official relation adopted by the other States." In Mechem on Public Officers, § 464, it is said: "Neither, except in North Carolina, can a public office be regarded as the property of the incumbent." Since this work of Mr. Mechem was published, the Supreme Court of North Carolina has repudiated the doctrine that an incumbent can claim that he has a property right in a public office, in the case of Mial v. Ellington, 134 N. C. 131 (46 S. E. 961, 971, 65 L. R. A. 697), where the court said: "To conclude the matter, the doctrine of Hoke v. Henderson [15 N. C. 1, 25 Am. D. 677] is based upon the proposition, that public office is private property, with all the results that logically flow therefrom. In so far as that case holds this proposition to be law, we expressly overrule it, and declare that no officer can have a property in the sovereignty of the State; that, in respect to offices created and provided for by the constitution, the people in convention assembled alone can alter, change their tenure, duties or emoluments, or abolish them; that, in respect to legislative offices, it is entirely within the power of the legislature to deal with them as public policy may suggest and public interest may demand." In Throop on Public Officers, § 345, this text is employed: "As we have shown in a previous chapter, in this country an office is not regarded as property, nor has the officer any vested rights therein which are within the protection of the United States constitution or the general provision of a State constitution forbidding legislative interference with property or vested rights. It follows, that the power of the legislature in this respect is practically unlimited, except where it is limited by the provisions of the constitution having express or implied reference to this particular subject." In 23 Am. & Eng. Enc. Law, 328-9, it is said: "It is well settled in the United States, that an office is not the property of the office-holder, but is a public trust or agency; that it is not held by contract or grant; that the officer has no vested right therein; and that, subject to constitutional restrictions, the office may be vacated or abolished, the duties thereof changed, and the term and compensation increased or diminished. The fact that a constitution may forbid the legislature to abolish a public office, or diminish the salary thereof during the term of the incumbent, does not change the character of the office, nor make it property." On page 405 of the same volume of this work, it is said: "It is within the power of

the legislature, in the absence of constitutional restriction, to shorten the term of a public office, even though the term of the person in office is thereby shortened, or to abolish the office during the term of an incumbent, or to declare the same vacant. The exercise of such power by the legislature does not violate the constitutional inhibitions against passing any law impairing the obligation of a contract or depriving any person of property without due process of law; for a public office is not the property of the incumbent, nor does the incumbent hold by grant or contract." And again, on pp. 420, 421, appears the following: "In the absence of any fundamental restriction, the legislature may abolish any office of its own creation, without regard to the term, and even though the constitution provides that such officers shall hold their offices for the term for which they were elected." In the case of Taylor v. Beckham, 178 U. S. 548, 577 (20 Sup. Ct. 890, 44 L. ed. 1187), the Supreme Court of the United States said: "The decisions are numerous to the effect that public offices are mere agencies or trusts, and not property as such. Nor are the salary and emoluments property, secured by contract, but compensation for services actually rendered. Nor does the fact that a constitution may forbid the legislature from abolishing a public office or diminishing the salary thereof during the term of the incumbent change its character or make it property. True, the restrictions limit the power of the legislature to deal with the office, but even such restrictions may be removed by constitutional amendment. In short, generally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right." The language of the constitution of the United States and that of this State in regard to the matter under consideration is substantially the same. In the former it is, "nor shall any State deprive any person of life, liberty, or property, without due process of law;" and in the latter, "No person shall be deprived of life, liberty, or property, except by due process of law." If an office is not property under one, it is not under the other. There are numerous decisions of the courts of last resort in the different States holding that a public office is not the property of the incumbent. They may be found in the notes to the text hereinbefore and hereinafter cited. Since the Supreme Court of North Carolina has repudiated the doctrine that a public office

is the property of the incumbent, we know of no decision of the Supreme Court of any State holding that it is. In this connection, see Mechem on Public Officers, § 463; Throop on Public Officers, §§ 18, 19; Cooley on Const. Lim. (7th ed.), pp. 387, 388; 29 Cyc. 1415; 32 Cyc. 653.

It was contended that while it might be that, as against the power of the State, an office was not property and the occupant could not assert a property right therein, yet, as between two rival claimants to the office, it was property, or in the nature of property. If it be conceded that, office being a public trust or agency, the person clothed by the State with the right to exercise the functions of an office can question the right of any other person to oust him therefrom illegally, yet in this proceeding it appears that McLendon had been removed from the office and Gray had been appointed to fill the vacancy. Therefore Gray was clothed with whatever right to exercise the duties of the office the State had the power to confer upon him. Hence, it was not a question as to two rival claimants of a piece of private property, but it became a question as to whether the legislature could remove McLendon and the Governor fill the vacancy thus occasioned. In other words, it resolved itself into the very question we have been discussing—did the legislature, under the provisions of the act of 1879, have the power to remove a commissioner? We have held that the legislature had such power. The removal was made, and a vacancy thus created before Gray was appointed. He was appointed by the Governor, in accordance with the terms of the act, to fill the vacancy thus occasioned; and the Governor had the authority of law to do so.

8. Complaint is made that the provision in the act of 1879 giving to the Governor the power of suspension and to the legislature the power of removal is void, because violative of art. 1, sec. 3, par. 2, of the State constitution (Civil Code, § 5730), providing that, "No bill of attainder . . shall be passed." In Cooley's Const. Lim. (7th ed.) 368, it is said: "Attainder, in a strict sense, means an extinction of civil and political rights and capacities; and at the common law it followed, as of course, on conviction and sentence to death for treason; and, in greater or less degree, on conviction and sentence for the different classes of felony. A bill of attainder was a legislative conviction for alleged crime, with judgment of death." And on pp. 369, 370, the following text is

employed: "Those legislative convictions which imposed punishments less than that of death were called bills of pains and penalties, as distinguished from bills of attainder; but the constitutional provisions we have referred to were undoubtedly aimed at any and every species of legislative punishment for criminal or supposed criminal offenses; and the term 'bill of attainder' is used in a generic sense, which would include bills of pains and penalties also." Also, in this connection, see 1 Words & Ph. 620-621, 779-780. Considering that a bill of attainder includes a bill of pains and penalties, it does not cover the action of the General Assembly in removing McLendon from the office of railroad commissioner. The action of the legislature in removing him convicted him of no crime, nor did it inflict on him any punishment. It simply deprived him of the right to hold the particular office of railroad commissioner at the time, and did not even deprive him of the right subsequently to hold the office of railroad commissioner, or any other office in this State.

9. The act of 1879 provides: "Any commissioner may be suspended from office by order of the Governor, who shall report the fact of such suspension, and the reason therefor, to the next General Assembly; and if a majority of each branch of the General Assembly declare that said commissioner shall be removed from office, his term of office shall expire." It is urged, that, as the Governor suspended McLendon during a session of the General Assembly, this General Assembly had no right of removal; that the Assembly could not remove unless the Governor suspended; and that the Governor had no right to suspend while the General Assembly was in session. Under art. 3, sec. 1, par. 1, of the State constitution (Civil Code, § 5744), it is declared that the General Assembly "shall consist of a Senate and House of Representatives;" and under art. 3, sec. 4, par. 1 (Civil Code, § 5749), it is provided that "The members of the General Assembly shall be elected for two years." Annual sessions of the General Assembly are provided for. The fact that the Assembly elected for two years has two sessions before it ceases to exist does not mean that there are two separate and distinct General Assemblies. Regardless of how many regular or extraordinary sessions a General Assembly may have during the two years for which the members are elected, it is during each session the same General Assembly during

such two years.   There can be but one General Assembly during the two years for which the members of any General Assembly may be elected.   The act of 1879 does not provide that the Governor shall report to the next meeting of the General Assembly. Hence, it follows that if the Governor suspends a commissioner after the General Assembly has convened, if he is not to report this fact and his reasons to this General Assembly, the report would have to be made to the one which would next be elected, and which would not convene until after two years had expired.   The act says the Governor shall report to the "next General Assembly;" and if he suspends after one has convened, if the interpretation of the act contended for by counsel for relator were correct, the report could not go to the next session of that Assembly, because every time it convened it would be the same General Assembly which was in session when the suspension was made, and such next session would not be the next General Assembly.   We do not think the construction of the act insisted on by counsel for relator a proper one.   The meaning of every word is to be determined by the context, and the word "next" in the act means nearest in point of time after the suspension; and if a General Assembly was then in session, it would mean that one.   There is nothing in the act saying that the Governor shall not suspend while the General Assembly is in session.   In the case of State *v.* Williams, 6 S. D. 119 (60 N. W. 410), the court had under consideration an act providing that "the mayor shall have power to remove any officer appointed by him, whenever he shall be of the opinion that the interests of the city demand such removal, but he shall report the reasons for such removal to the council at its next regular meeting."   On p. 125 it was said: "The power thus conferred is absolute, and without any other limitation or qualification than that he shall be of the opinion that the interests of the city require such removal.   The last clause of the section is not in the nature of a proviso or condition precedent to such removal, but a requirement that the mayor shall make the report therein specified, evidently for the purpose of apprising the city council and the citizens generally of the reasons for such removal; and a failure to make this report does not affect the action of the mayor in making the removal.   This is evident from the fact that the mayor is not required to report the reasons for his proposed removal, but 'the reasons for such re-

moval.' This language presupposes that the officer has been actually removed. Again, the mayor is required to réport to the city council 'at its next regular meeting.' This language also presupposes that the act of removal has been accomplished, and that the next regular meeting is the one occurring after such removal. This construction of the section is strengthened by the fact that the city council is charged with no duty in reference to the removal. It is not vested with any power to approve or disapprove of the action of the mayor. No action on the part of the city council is required in reference to the report, and none is contemplated by the section. Any action, therefore, of the city council upon the report, confirming or rejecting the same, would not in the slightest degree affect the order of the mayor making the removal." The act we are construing did provide that the General Assembly to which the report of the Governor was to be made should restore or remove the suspended commissioner. In the case of State v. Ashell, 57 Kan. 398, 404 (46 Pac. 770, 772), the court said : "The two sections seem to be somewhat inconsistent, but the express provision of 157 must prevail over a mere inference drawn from 57. The word 'next' means 'nearest,' and the words 'next term,' as used in section 57, when construed in connection with section 157, may be taken to mean the 'nearest term' at which the cause is triable." The act did not mean that when a suspension was made by the Governor after the General Assembly had convened, his report should be made to the one next elected, and the suspension held in existence and not acted on for two years and until another General Assembly was elected. If such were the case, the General Assembly in session at the time of suspension could not remove the officer suspended, unless it could do so by impeachment proceedings. The policy of this law was to give an expeditious way of preventing a commissioner from acting, by suspension of the Governor, without notice or hearing. At the same time, the General Assembly had the right of simple removal without impeaching the officer suspended, with the attending consequences of disqualification to hold office following impeachment.

10. It is urged that the provision of the act of 1879 for suspension by the Governor and removal by the General Assembly is contrary to that provision of the constitution contained in the Civil Code, § 5720, that "The legislative, executive, and judicial

powers shall forever remain separate and distinct, and no person discharging the duties of one shall at the same time exercise the functions of either of the others, except as herein provided," in that it undertakes to confer upon the legislature the power to remove by resolution a public officer (the office not being abolished), which power is judicial in its nature, and can, therefore, be exercised by the legislature under and by virtue of its constitutional power of impeachment alone, and not by a mere vote, resolution, or declaration. This is especially urged to be true because under the law McLendon was elected by the people. The second section of the fourth article of the State constitution (Civil Code, § 5797), provides: "The power and authority of regulating railroad freights and passenger tariffs, preventing unjust discriminations, and requiring reasonable and just rates of freight and passenger tariffs, are hereby conferred upon the General Assembly, whose duty it shall be to pass laws, from time to time, to regulate freight and passenger tariffs, to prohibit unjust discriminations on the various railroads of this State, and to prohibit said roads from charging other than just and reasonable rates, and enforce the same by adequate penalties." To carry out this provision of the constitution the act of 1879 was passed, providing for a railroad commission. The railroad commission is an administrative board to carry out the law enacted by the legislature in compliance with this provision of the constitution. In State *v.* Wilson, 121 N. C. 425 (28 S. E. 554), it was said: "The office of railroad commissioner being purely of legislative origin, and administrative duties, the action of the legislature in reserving the right of removal was not beyond its constitutional power." This case was carried to the United States Supreme Court (Wilson *v.* North Carolina, 169 U. S. 586, 594 (18 Sup. Ct. 435, 42 L. ed. 865)), and that court, in affirming the decision of the State court, said: "In its internal administration the State (so far as it concerns the Federal Government) has entire freedom of choice as to the creation of an office for purely State purposes, and of the terms upon which it shall be held by the person filling the office." In 23 Am. & Eng. Enc. Law, 652, it is said: "If not restrained by a constitutional provision, the legislature may abridge the term of office of a railroad commissioner, or specify an event upon the happening of which such term shall end, or many reserve to itself the right to remove the in-

cumbent of the office, or to the Governor the right to suspend him."
In the same volume, on page 428, it is said : "While the decisions
are not in accord as to the nature of the power of removal, con-
sidered as an abstract question, the consensus of opinion is, that
it is not judicial, in the absence of fundamental restrictions, in
the sense that its exercise may not be vested in the executive branch
of the government, or in the municipal boards and bodies, or even
be retained by the legislature itself, without violating the constitu-
tional distribution of powers."    In 29 Cyc. 1406, it is said : "As
the right to hold office is not a vested right, the legislature may,
within the limits of the constitution, provide methods by which the
incumbents of office may be removed from office before the ex-
piration of their terms."    On page 1408 of the same volume, it is
stated : "Proceedings to remove are not commonly regarded as
judicial in character."    We quote further from the same work :
"Power to suspend may be exercised without notice to the person
suspended, and the suspension, when made in the exercise of a legal
power to suspend, is irreviewable by the courts."    29 Cyc. 1405.
"While the power to remove from office is regarded as a power
possessed by the courts in the absence of its expressed or implied
grant to some other authority in the government, the courts hold
that this power may be exercised by the legislature by declaring
the office to be vacant, or may be delegated by the legislature to
some other authority."    29 Cyc. 1371.    "Public offices are cre-
ated, and their tenure, compensation, manner of choosing and re-
moving the incumbents, and all regulations, including power to
abolish, are prescribed either by constitutional provisions or by
statutes enacted in pursuance of such provisions."    8 Cyc. 763(6).
In Throop on Public Officers, § 402, it is said : "In the absence of
any express constitutional restriction on the power of the legisla-
ture, it may provide by statute for the suspension of a public officer
by some other officer or board."    We quote also from Mechem on
Public Officers : "But it is a common provision in national, state,
and municipal governments that the president, governor, mayor,
or other officer shall have the power to remove for cause officers not
only appointive but elective.    Such a provision is indispensable to
the proper exercise of the public functions, and is clearly within the
authority of the sovereign power."    § 447.    "The power of re-
moval so conferred, like the power to appoint, may be absolute or

conditional. It is absolute when it is vested in the unlimited discretion of the removing officer to be exercised at such time and for such reasons as the latter may deem proper and sufficient. It is conditional when the time, the manner, or the reason is placed beyond the mere discretion of the removing officer." § 448. "It is, however, within the power of the legislature, where it has given the authority to appoint to an office created by it, to authorize the removal of the incumbent without notice or hearing, as when the executive is authorized to remove 'for any cause deemed sufficient to himself.' " § 454. "Where, then, an office is created by statute, it may, in the absence of constitutional prohibitions, be entirely abolished, or its term may be increased or diminished, or the manner of filling it may be changed, or its compensation may be altered, or its duties may be diminished or increased, at the will of the legislature at any time, even though done during the term for which the then incumbent was elected or appointed. So the legislature may declare the office vacant, or may transfer its duties to another officer, although the effect may be to remove the officer in the middle of his term, or to abolish his office by leaving it devoid of duties." § 465. In the case of State *v.* Dahl, 140 Wis. 301 (122 N. W. 748), decided October 5, 1909, the court held: "The power of amotion from office is not a judicial but an administrative power, though it be exercised in a judicial manner." In this connection, see *Asbell* v. *Mayor &c. of Brunswick,* 80 *Ga.* 503, 505 (5 S. E. 500).

It is difficult to draw a distinct line of demarcation between the powers of the legislative, judicial, and executive departments of the government. It is clear from the authorities above cited, and the many decisions cited in the notes to the text above quoted, that the power of removal of one holding public office is not necessarily judicial in its nature. This is especially true when it is not provided that the removal shall be for cause. The office of railroad commissioner was created by the legislature, and the creating power had the right to prescribe the terms upon which the office might be held. Any one accepting the office did so subject to these terms. Such person could not take the office except on the terms imposed by the act creating it. He had to accept both the office and the conditions under which it could be held, or had to reject both. In the case of State *v.* Hawkins, 44 Ohio St. 98 (5 N. E. 228, 235-6),

it was said: "The manner of filling and vacating the office being unaffected by constitutional provisions, the manner prescribed by the legislature must prevail in either case.    It is a strange sort of logic which reaches the result that the office may be accepted in the manner prescribed by the legislature, and the mode of removal rejected."    See State v. Johnson, 30 Fla. 433 (11 So. 845, 11 L. R. A. 410).    The fact that the legislature provided for the election of the railroad commissioners by the people did not prevent the Governor from having the right of suspension and the General Assembly the right of removal.    A commissioner elected by the people acquired no greater right to the office than one appointed by the Governor under the original act providing for the appointment of such officers by the Governor.    Under the present act providing for their election by the people, they are elected to the office for the same fixed period of six years for which they were formerly appointed.    The power of suspension and removal, at discretion, of an officer holding an office of legislative origin is not a judicial power because the officer suspended or removed is elected by the people for a fixed term.

11.    It is contended that McLendon's removal from office "is illegal, void and of no effect, in that the same was contrary to all principles of justice and equity upon which the government of the United States and of the State of Georgia are founded," in that he was removed from office "without any trial or without any finding that he was in fact guilty of the charges preferred by the Governor, or any of them."    It is urged that his removal was against the spirit of our institutions and that of the constitution.    In 8 Cyc. 778, it is said: "The generally accepted rule is, that courts will not declare a statute void merely because in their opinion it is opposed to the 'spirit' supposed to pervade the constitution."    On page 777 of the same volume it is said: "It may be stated as a general principle, that statutes will not be held unconstitutional merely because they are unjust and repugnant to the general principles of justice, liberty, or rights, not expressed in constitutional provisions."    In Cooley's Const. Lim. 239, 240, it is said: "Nor are the courts at liberty to declare an act void because in their opinion it is opposed to a spirit supposed to pervade the constitution but not expressed in words.    When the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the

legislature, we can not declare a limitation under the notion of having discovered something in the spirit of the constitution which is not even mentioned in the instrument." On p. 236, the same author says: "The rule of law upon this subject appears to be that except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the State except as those rights are secured by some constitutional provision which comes within their judicial cognizance. The protection against unwise or oppressive legislation within constitutional bounds is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts can not assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the constitution. It can not run a race of opinions upon points of right, reason, and expediency with the lawmaking power." In 6 Am. & Eng. Enc. Law, 1087, it is said: "A statute should not be annulled on the vague ground of its conflict with the general latent spirit supposed to pervade or underlie the constitution, but which neither its terms nor its implications clearly disclose." See, in this connection, *Flint* v. *Foster,* 5 *Ga.* 194 (48 Am. D. 248); *Plumb* v. *Christie,* 103 *Ga.* 686, 692 (30 S. E. 759, 42 L. R. A. 181). This court has no authority to declare void a law on any alleged ground that it violates the spirit of our government and its institutions, or the principles upon which they are founded. Courts can not declare a law void because it violates the spirit of the constitution. To be nugatory, it must be repugnant to the constitution itself—not to the general atmosphere pervading it, but its provisions. The constitution of this State (Civil Code, § 5784) provides: "The General Assembly shall have power to make all laws and ordinances consistent with this constitution, and not repugnant to the constitution of the United States, which they shall deem necessary and proper for the welfare of the State." A law is void, or not void, as measured by this clause of the constitution. When the General Assembly passes an act, unless we can point to some clause of the constitution of this State with which it is not consistent, or some clause of the constitution of the United States to which it is repugnant, it is a valid law. By no other rule are we to determine

whether an act has any real existence. We can not determine whether or not a law is valid by our idea of what may be that undefinable and intangible thing called the spirit of the constitution. We can no more declare a law void because we think it guilty of violating the spirit of the constitution, than can a citizen be convicted of crime because he violates what might be thought to be the spirit of the penal laws. If an act does not violate some provision of either the State or Federal constitution, *it is the law*, and it is the duty of the courts to uphold it. The courts will not declare any law unconstitutional unless it is clearly and palpably so.

Respondent Gray filed a plea of estoppel. This plea was stricken on a demurrer filed by McLendon. We have not considered the question as to whether or not it was proper to sustain the demurrer to this plea and strike it, for the reason that the other rulings we have made make it unnecessary to do so. The court below committed error in overruling the general demurrer of Gray to the information filed by McLendon, and in making the rule absolute, and in issuing a writ of ouster against the respondent.

*Judgment reversed. All the Justices concur, except Fish, C. J., absent.*