29026. JACKSON et al. v. INMAN.
29054. INMAN v. JACKSON et al.
29066. JACKSON et al. v. INMAN.

PER CURIAM.

These three related appeals involve contests between Chief of Police John F. Inman on one side and the City of Atlanta, the Mayor of Atlanta, one of his appointees, and the Atlanta City Council on the other side. For simplicity, the parties will be referred to as Chief Inman and the City.

The 1973 General Assembly enacted a new charter for the City which was effective January 7, 1974, except for the election of elected officers which took place in 1973.

The new charter provided in Sec. 7-104 for the initial administrative organization of the new government by the enactment of an ordinance according to the home rule procedures of Code Ann. § 69-1017 (b) (1).

The council enacted an initial organization ordinance on March 4, 1974, which was approved by the mayor on March 7, 1974. For purposes of these appeals, the effect of this ordinance was to create a Department of Public Safety headed by a commissioner. Included in the department were a Bureau of Fire Services, a Bureau of Civil Defense, and a Bureau of Police Services.

Chief Inman then filed suit (No. 29054) against the City to prevent any action pursuant to the ordinance that would tend to reduce the Police Department from its present status as a "department" of the city government. This suit also sought: to prevent the appointment of a Commissioner of Public Safety, to prevent interference with Chief Inman's normal performance of duties as Chief of Police, a declaration that the ordinance was in conflict with Section 3-301(d) of the new charter, and a declaration that the ordinance deprived Chief Inman of property and contract rights that he had as Chief of Police.

The parties then entered into a stipulation of facts and agreed for the trial judge to hear and decide all issues in the case.

The trial judge did so, and on May 3, 1974, he entered

a judgment that: (1) denied permanent injunctive relief against the City; (2) declared that the ordinance shall not affect any salary or remuneration paid to Chief Inman prior to the ordinance, nor his salary rate after enactment of the ordinance; (3) declared that Chief Inman would be eligible for the office of Department Head Emeritus after having served twenty-five years with the City, eight years of which shall have been served in the position of Chief of Police or any comparable position provided in the future; (4) and denied all other declaratory relief sought by Chief Inman.

Chief Inman obtained an order superseding this judgment pending appeal, and he appealed to the Court of Appeals. The Court of Appeals transferred the case to this court since proper appellate jurisdiction is in this court.

After the entry of the May 3rd judgment in No. 29054, the City suspended Chief Inman as Chief of Police and appointed Clinton Chafin as acting head of the Bureau of Police Services.

On May 6, 1974, Chief Inman filed suit (No. 29026) against the City. He contended that his suspension was null and void, and he sought to temporarily and permanently enjoin the City from interfering with him in the performance of his duties as Chief of Police.

In May 21, 1974, the trial judge conducted a hearing and entered a judgment that: (1) temporarily enjoined the City from implementing Chief Inman's suspension, and (2) temporarily enjoined the City from interfering with Chief Inman in the performance of his duties.

The City then appealed to this court, and this is Case No. 29026.

After No. 29026 was docketed in this court, Chief Inman filed amendments in the trial court to his second suit. These amendments sought injunctive relief and attacked the constitutionality of the new charter of the City, and on June 19, 1974, the trial judge entered a judgment: (1) declaring the new charter unconstitutional, (2) enjoining the City from interfering with Chief Inman in the performance of his duties as Chief of Police, and (3) enjoining the City from conducting a trial of Chief Inman.

The City appealed to this court, and this is Case No. 29066.

Because of the public importance of the issues presented by these appeals, they were advanced on this court's calendar for determination at the earliest practicable date. We now proceed to that determination.

The judgment in No. 29066 is reversed. This means that the City's new charter is constitutional and valid.

The judgment in No. 29026 is partly affirmed and partly reversed. This means that Chief Inman was not an appointed director of a department under Section 3-301(d) of the new charter and could not be suspended in accordance with its provisions. However, because of our rulings in the other two cases, the remainder of this judgment is reversed.

The judgment in No. 29054 is affirmed. This means that the City can proceed with reorganization under its new charter, but Chief Inman's rights specified in the trial court's judgment are preserved.

I.

The judgment in No. 29066 which declared the special Act of 1973 (Ga. L. 1973, p. 2188 et seq.), creating a "New Charter" for the City of Atlanta, to be unconstitutional is challenged in this appeal. We believe this issue was properly raised in DeKalb Superior Court and that court was authorized to decide the constitutionality of the City's "New Charter."

The trial court decided the legislature was powerless to adopt this "New Charter" for Atlanta. It determined the "New Charter" was a "very large amendment" to the existing charter which the City had authority to amend under general home rule laws. The Georgia Constitution (Code Ann. § 2-401) prohibits the adoption by the General Assembly of a special law covering a subject matter for which provision is made by an existing general law. The general laws available to the City for use in revising its government are those found in the 1962 and the 1965 Municipal Home Rule Acts, as amended. These laws were enacted by the General Assembly under the authority of the 1954 Home Rule Constitutional Amendment (Code Ann. § 2-8301). See *Plantation Pipeline Co. v. City of Bremen,* 227 Ga. 1 (178 SE2d 868).

The essential question we face in reviewing the constitutionality of Atlanta's "New Charter" Act is whether this special Act was necessary to authorize the City to make the changes made in its government or whether these changes could be made by the City under the general home rule laws. We conclude the special "New Charter" Act was necessary because the existing general laws did not provide sufficient authority for the City to make the fundamental and substantive changes which have been made in the city government.

Some insight into the legislative purpose of the special "New Charter" Act of 1973 can be gained by reviewing its forerunner which created the City of Atlanta Charter Commission. In Ga. L. 1971, p. 4104, the General Assembly created and directed a charter commission to "completely revise the charter of the City of Atlanta" and provided that the revision "shall take the form of a new charter which . . . would supersede and replace [the] present charter." The revision was to include "such substantive changes as the commission may deem necessary and appropriate for the improvement of the government of the City of Atlanta."

An examination of the new charter clearly reveals that the city government has been changed drastically from a strong commission form of government, under which the board of aldermen legislated and supervised 26 administrative departments of the city through committees, to a new form of government, with the mayor as the executive, and the council as the legislative body, requiring a classic separation of powers not contained in the old form of government.

Even a casual observer of Atlanta city government will recognize that the new charter was designed to create a new form of government structured to handle the burdensome and ever growing public demands imposed on the government of large urban areas. This was clearly intended to be accomplished by the 1973 special Act of the General Assembly creating a "New Charter" for Atlanta.

The General Assembly has reserved the legislative power to enact new charters for existing cities when such charters include drastic changes in the composition and

form of city government and the election and terms of office of the members of the governing authority of cities as in this new charter for Atlanta. This specific power was expressly reserved by the General Assembly in the 1965 Home Rule Act and is found in Code Ann. § 69-1018 (a) 1.

It is argued that some of the powers given the City of Atlanta in the new charter can also be found in the Home Rule Statutes, and therefore this prevented the General Assembly from exercising its reserved legislative power. This argument is not persuasive as the City of Atlanta, through the exercise of general home rule powers, legally could not change the form and composition of its government and the election and terms of office of its elected officials without this special Act of the legislature. We believe the reserve power of the General Assembly was sufficient to authorize the creation of the new charter for Atlanta, and we see no reason why the General Assembly could not allow the City to continue exercising the existing general home rule powers the City already enjoyed in common with other municipalities.

In addition, we find no provision in the 1962 Home Rule Act which pre-empted the constitutional adoption of the 1973 special Act creating a new charter for the City of Atlanta. Therefore, we conclude that the power to adopt an entirely new charter such as the one here involved cannot be found in either or both of the present home rule statutes. Consequently, this legislative power still resides in the General Assembly under the Constitution. Code Ann. § 2-1301.

The contention is also made that Atlanta's new charter constitutes a non-uniform delegation of legislative authority which is not permitted by the Constitution of Georgia. The uniformity requirements previously contained in the Constitution (Code Ann. § 2-8301) were replaced by the 1954 home rule amendment to the Constitution. The language of this constitutional section (§ 2-8301), as now amended, does not provide a uniformity requirement for new municipal charters and this was acknowledged by the decision of this court in *Bobo v. Mayor &c. of Savannah Beach,* 216 Ga. 12 (114

SE2d 374) (1960). Therefore, the General Assembly is constitutionally free to exercise its *reserved* legislative power on a non-uniform basis when it enacts a new charter for a municipality as it did for Atlanta.

In summary, it is our opinion the special Act of 1973 creating a new charter for the City of Atlanta is not subject to the constitutional attacks made on it in this case, and the judgment of DeKalb Superior Court declaring the Act unconstitutional is reversed.

II.

Having held that the City's new charter is constitutional and valid, the only remaining issues relate to the rights and status of Chief Inman under the new charter. Section 3-301(d) of the new charter provides in part as follows: ". . . all present directors of departments serving under appointment of the mayor shall continue to serve until the expiration of their present term of office as now provided by law on the effective date of this charter. The mayor shall be authorized to suspend and/or remove directors of departments during their term of office but any removal shall not become effective for a period of twenty-one (21) calendar days following the date of the mayor's giving of written notice of such action and the reasons therefor to said director with a copy thereof to the Council."

We conclude that Chief Inman is not a director of a department of the City appointed under the provisions of the new charter but is an "interim" director pending reorganization under § 7-104 of the new charter. Therefore, he could not be suspended under § 3-301(d) of the new charter, which provides that only directors of departments appointed under the new charter can be suspended in the manner specified. As Chief Inman was not on May 3, 1974 an appointed director of a department under the new charter, his attempted suspension on that date was null and void. However, following implementation of the new charter by the appointment of department and division heads under the charter, the position of "interim" director will no longer exist. The suspension or removal of department heads appointed or reappointed under the 1973 Charter, including Chief Inman should he be appointed thereunder, shall be

governed by the provisions of the 1973 Charter.

We hold that that part of the judgment in No. 29026 that temporarily enjoined the City from implementing Chief Inman's suspension was correct, but that part of the judgment that temporarily enjoined the City from interfering with Chief Inman in the performance of his duties was incorrect.

### III.

We conclude that the judgment of DeKalb Superior Court temporarily enjoining the City Council of Atlanta from conducting a trial for the removal of Chief Inman under the provisions of the old charter of the City, pending appointments under reorganization, is erroneous. Under the new charter of the city, the council is the de jure successor to the old Board of Aldermen and it is the proper body to conduct such a trial. However, any such trial must be conducted in accordance with the provisions of the charter of the City in effect at the time Chief Inman was elected by the old Board of Aldermen.

### IV.

The judgment in No. 29054 permitted the City to proceed with reorganization under its new charter. It also specified that Chief Inman had certain rights and status with the City. Chief Inman appealed this judgment, his main contention being that the City could not proceed with reorganization under the new charter. The City did not cross appeal and has not complained of the specified rights and status of Chief Inman with the City contained in this judgment. We, therefore, hold that the trial court's judgment in No. 29054 was correct, and it is affirmed in its totality.

*Judgment in No. 29066 reversed. Judgment in No. 29026 affirmed in part; reversed in part. Judgment in No. 29054 affirmed. All the Justices concur, except Gunter, J., who concurs specially in Division 3, and Nichols, P. J., and Undercofler, J., who dissent.*

ARGUED JUNE 25, 1974 — DECIDED JULY 3, 1974 —
REHEARING DENIED JULY 23, 1974.

*Henry L. Bowden, Henry R. Bauer, Jr., John E. Dougherty, James H. Weeks, Charles M. Lokey,* for Jackson.

*Wesley R. Asinof, Durwood T. Pye,* for Inman.

GUNTER, Justice, concurring specially.

It is my view that since the effective date of the reorganization ordinance, March 7, 1974, Chief Inman has not been a "director" of a department of the city. He therefore cannot be suspended by the mayor or tried by the council under the provisions of Section 3-301 (d), of the new charter. Only directors of departments can be suspended and tried by the council. All other personnel employed by the City, except the elected officials, the directors of departments, and the "Chief Administrative Officer," are governed by Section 3-501 of the new charter. That provision provides that the council shall establish a system of civil service and enact rules and regulations governing the "employing and appointing and *dismissing* personnel."

The court has held that the new charter is constitutional and that the reorganization ordinance was enacted. Since it is my view that Chief Inman is not a director of a department of the City, he is subject to dismissal pursuant only to the provisions of Sections 3-501 and 3-503 of the new charter.

I would therefore hold that after March 7, 1974, Chief Inman could not and cannot be suspended by the mayor and tried by the council.

With this explanation, I concur in the judgments rendered by the court.

NICHOLS, Presiding Justice, dissenting.

While I agree that the 1973 Charter of the City of Atlanta is not subject to any of the constitutional attacks made in this case, I can not agree that the 1973 charter deprives Inman of any rights, responsibilities or duties to control the Police Department during his term of office.

"A public office is a public trust and is not the property of the incumbent. A public officer has no vested

right in the compensation of his office. *Moseley v. Garrett,* 182 Ga. 810, 815 (187 SE 20); *Walton v. Davis,* 188 Ga. 56, 58 (2 SE2d 603), and citations." *Burpee v. Logan,* 216 Ga. 434, 436 (117 SE2d 339). Yet, the holder of public office can not in all cases be summarily removed.

The earlier decision of this court in *Walton v. Davis,* 188 Ga. 56, 62 (2 SE2d 603), relied upon as authority in *Burpee v. Logan,* held: "To accept an office created by legislative authority with knowledge of the fact that the holder may be ousted without cause by the appointing power, or at the will of some one to whom that power has been delegated, is one thing. To be inducted into an office for a fixed term, with the right to have the office declared vacant only for certain specified causes which concern the holder, is a far different thing. In the former, the holder is granted his commission with the proviso that he may be at any time ousted at the will of another; and he takes the office with that understanding and its tenure limited by the possibility that it may be shortened without cause. *Gray v. McLendon,* [134 Ga. 224 (67 SE 859)]; *Felton v. Huiet,* [178 Ga. 311 (173 SE 660)]. In the latter, the right to deprive the holder of his office, its honor, and its perquisites and emoluments, is dependent upon the determination of certain facts; and before such facts are determined, he is, according to the law of the land, entitled to notice and an opportunity to be heard. In such a case, to oust him without notice and without a hearing is to deny him due process of law, and to withhold from him rights which have been vouchsafed to freemen and which they have enjoyed almost for 'time whereof the memory of man runneth not to the contrary.' "

In *McDuffie v. Perkerson,* 178 Ga. 230, 234 (173 SE 151, 91 ALR 1002) what constitutes public office was discussed in detail as follows: " 'An individual who has been appointed or elected in a manner prescribed by law, who has a designation or title given him by law, and who exercises functions concerning the public, assigned to him by law, is a public officer.' *Bradford v. Justices,* 33 Ga. 332; *Polk v. James,* 68 Ga. 128 (2); *Wiley v. Sparta,* 154 Ga. 1, 14 (114 SE 45, 25 ALR 1342); 46 CJ 928, § 19. In 22 RCL 372, § 2, it is said: 'Since one who holds an office

is an "officer," it becomes necessary to ascertain what, properly considered, is an "office." The definitions of this word, as given by the text-writers and courts, are not in entire harmony. Blackstone (2 Com. 36) defines an office as the right to exercise a public or private employment, and to take the fees or emoluments thereunto belonging. Thus it has been said that everyone who is appointed to discharge a public duty, and who receives a compensation in whatever shape, whether from the crown or otherwise, is a public officer. A distinction is drawn between public and private officers, the former being those whose functions and duties concern the public. *The term "public officer" involves the idea of tenure, duration, fees or emoluments, and powers, as well as that of duty.* [Emphasis supplied.] These ideas or elements can not properly be separated and each considered abstractly. All, taken together, constitute an office. But it is not necessary that an office should have all of the above-named characteristics, although it must possess more than one of them, and the mere fact that it concerns the public will not constitute it an office.' In 46 CJ 929, § 21 c, it is said: 'The term "public office" embraces the ideas of tenure and of duration or continuance; hence an important distinguishing characteristic of an officer is that the duties to be performed by him are of a permanent character as opposed to duties which are occasional, transient, and incidental. But it is held that this element is not essential where the other qualifications of officers are present. Public employments are public offices, notwithstanding the instability of the tenure by which the incumbent holds.' So we find that even that test is not conclusive. The decision in State ex rel. Barney v. Hawkins, 79 Mont. 506 (257 P 411, 53 ALR 583), dealt with the question of what are the essential elements to constitute public office. The court discussed the question elaborately and assembled a great number of cases throughout the country dealing with that question. Also, the case has been thoroughly annotated in ALR and reference is made thereto rather than to collect all of the same authorities in this opinion. In Wyman's Administrative Law, 163, § 44, it is said: 'A public office, then, is the right, authority, and duty

conferred by law by which for a given period, either fixed by law or through the pleasure of the creating power of government, an individual is invested with some portion of the sovereign functions of the government, to be exercised by him for the benefit of the public. The warrant to exercise powers is conferred, not by a contract, but by the law. It finds its source and limitation in some act of expression of governmental power. Oath, salary, operation, scope of duties, are signs of the official status; but no one is essential. The essential thing is that in some way or other the officer is identified with the government.' "

In 1943 the Charter of the City of Atlanta was amended so as to define the powers etc. of the Chief of Police. This amendment read in part as follows: " '9-102(a). Chief of Police. The Chief of Police shall be the chief executive officer of the Department of Police, shall have full power and authority over the management and conduct thereof, and shall be charged with full and complete responsibility for its successful and efficient operation. He shall faithfully execute all laws of the State of Georgia and ordinances of the City of Atlanta. He shall have power and authority to give such orders to the officers and members of the Department of Police as he may deem proper; and it shall be their duty to render to him and his orders implicit obedience.

" '9-102 (b). Vacancy in office of Chief of Police. Whenever there shall be a vacancy in the office of the Chief of Police, such vacancy shall be filled by election by the Mayor and General Council, such election to be conducted as are other elections by the Mayor and General Council and under the same rules.'

" '9-102 (c). The Chief of Police shall have the exclusive power, and it shall be his duty to assign all officers and employees of the Police Department to their respective duties and to make such changes from time to time as he may deem proper and to the best interest of the Police Department of the City. The power herein conferred shall include the power to assign such members of the Police Department, in such numbers as he may choose to the various and sundry activities of the Department, such as traffic duty, plain clothes, detective

bureau, the various watches and the various territories where such members of the Police Department shall work.'

" '9-102 (d). The Chief of Police shall be subject to removal, suspension, or demotion by the Mayor and General Council after trial in the manner prescribed by the other provisions of this Charter. Any decision of the Mayor and General Council suspending, demoting or discharging such Chief shall be subject to review by the Superior Court of Fulton County on a writ of certiorari.' "

In *Yarn v. City of Atlanta,* 203 Ga. 543, 545 (47 SE2d 556), referring to the above provisions of the Charter of the City of Atlanta it was said, "It is thus made the duty of the Chief of Police to assign policemen to the performance of any duty within the department and confine them to any territory within the city limits which he may think advisable in the exercise of his judgment and discretion." Thus, at the time the Act "To Reincorporate the City of Atlanta. . .," supra, was enacted, the Chief of Police ran the Police Department subject only to the then mayor and general council *after trial,* subject to review by the superior court by writ of certiorari.

The 1973 Charter of the City of Atlanta stated in part as follows: "Section 7-101. The current terms of office of all elected and appointed officials and officers of the City and its agencies, serving on the effective date of this Charter, shall not be diminished and shall continue in full force and effect. Section 7-105. (a) Any rights or interest, public or private, vested in whole or in part on the effective date of this Charter, whose validity might be sustained or preserved by reference to any provisions of law repealed by this Charter, shall not be affected by this Charter. This Section shall not apply to any right or interest in any elective public office not conferred by this Charter."

The real question is did the new charter permit the dilution of the functions and powers of the Chief of Police by the creation of a new agency which would exercise the powers and duties previously granted the Chief of Police by legislative enactment? The initial administrative

organization provision of the 1973 Charter (Section 7-104) must be read in the light of Sections 7-101 and 7-105 of such charter. The current term of office of all elected and appointed officials and officers of the City referred to in Section 7-101 must be construed to refer to all elements of his term of office including *tenure, duration, terms, emoluments, and powers, as well as that of duty* and not merely salary and retirement benefits. When read together Sections 7-101, 7-104 and 7-105 do not authorize sweeping away of the total city government but rather an orderly transition which protects the tenure of previously elected and appointed officials for definite terms and assures the City that experienced and qualified personnel continue in office during such transition period. The ordinance provides that the mayor recommend for the council's consideration a proposal which shall specify the number of departments and the duties and the functions thereof and when adopted shall have the force of statutory law under the Home Rule Provisions of Code Ann. § 69-1017 (b) (1). Such ordinance shall become effective according to its terms for administrative and other purposes so long as it does not interfere with the tenure of the incumbents protected by Sections 7-101 and 7-105. As to these offices and these officers the law in effect must continue until the end of their term of office and their duties and responsibilities can not be diminished during such period of time.

Until the expiration of the term to which Chief Inman was elected he can be removed *only* as provided by the charter at the time of his election.

The net effect of the majority opinion is to repeal those Sections which preserve Chief Inman's status until the end of his current term of office.

I am authorized to state that Mr. Justice Undercofler concurs in this dissent.

ON MOTION FOR REHEARING.

PER CURIAM.

A motion for rehearing in the above three cases was filed in this court on July 9, 1974, on behalf of John F. Inman. This motion for rehearing contains seven separate grounds.

We have considered each of these grounds individually, reviewed the record again, and we conclude that none of the grounds for rehearing is meritorious.

We deem it necessary to comment on only one of the grounds, number five. The fifth ground of the motion for rehearing contends that this court's judgments in these cases are erroneous because: "The court has overlooked the fact that the 'initial reorganization' ordinance enacted by the new council March 4, 1974, and approved by the mayor March 7, 1974, does not have the force of law, and is insufficient to 'reorganize' the city government and create a Bureau of Police Services, diluting the duties of Chief Inman under the Act of 1963, pp. 1183, 1184, because such 'reorganization' can be accomplished under the new charter only by a home rule ordinance as provided in § 7-104 of the new charter (Ga. Laws 1973, p. 2249), even if such § 7-104 be valid."

As we read this ground five, it contends that the reorganization ordinance enacted by the council was not a "home rule ordinance" pursuant to § 7-104 of the new charter.

In all of this litigation, this contention is raised for the first time in ground five of the motion for rehearing. Chief Inman's original complaint, and all subsequent amendments and subsequent suit and amendments in DeKalb Superior Court, did not attack the procedural validity of the reorganization ordinance. All of Chief Inman's legal attacks were leveled only at section 6 of the reorganization ordinance. Paragraph 15 of the original complaint averred that "section 6 of the ordinance . . . is ultra vires, null, and void." The prayers of the original complaint were that the City be enjoined from acting pursuant to section 6 of the reorganization ordinance and that section 6 of the reorganization ordinance attached to the complaint as an exhibit be declared null and void.

The stipulation of facts entered into by the parties in the trial court in No. 29054, filed in the clerk's office May 2, 1974, contained the following: "An actual controversy exists between the plaintiff and defendant with respect to the issue which has arisen as set out in the complaint and plaintiff seeks a declaratory judgment of this court as to the validity of section 6 of the ordinance

attached to the complaint as exhibit A."

The City's brief, filed in the trial court and made a part of the record on appeal (R-52), contained the following: "Pursuant to the requirements of § 7-104 of the new charter, on the fourth day of February, 1974, the Mayor of the City of Atlanta presented to the council a proposed ordinance which specified the number of departments of the City and the duties and the functions of each. This proposed ordinance was duly passed on the fourth day of March, 1974, by the City Council of Atlanta and approved by the mayor on the seventh day of March, 1974."

Nowhere in the pleadings or argument, prior to the motion for rehearing, was the contention made that the ordinance was not enacted pursuant to § 7-104 of the new charter.

We consider this to be important because § 7-104 of the new charter permits the charter itself to be amended by a "home rule ordinance." The enactment of such an ordinance by the council amounts to an amendment of the City's new charter.

The Home Rule Act of 1965 provides that a municipality can amend its charter in any manner whatsoever except for the limitations prescribed in section 4 of that Act. There is no limitation contained in section 4 that prevents a municipality from amending its charter so as to abolish any or all departments contained in its municipal government. Therefore, a "home rule" charter amendment can be enacted by ordinance, and the new charter amendment so enacted supersedes and repeals any conflicting provisions contained in the charter prior to amendment.

As the original opinion of this court shows, these cases were decided on the premise that the ordinance in question was enacted pursuant to § 7-104 of the new charter. There was no contention to the contrary. Only section 6 of the ordinance was attacked.

Therefore, ground five of the motion for rehearing is denied; but we specifically hold that the procedural validity or invalidity of the entire ordinance has not been decided in these cases. This issue simply was not raised or considered in the trial court.

*Motion for rehearing denied. All the Justices concur, except Nichols, P. J., and Undercofler, J., who dissent.*